**Grace KEAMS, Jolene Cordero, Pandora Lee, and Bunny McCorkey; individually and on Behalf of all others similarly situated, Plaintiffs,**

v.

**TEMPE TECHNICAL INSTITUTE, INC., Carl E. Forsberg, C. Coleen Forsberg, Terry Lass, Jane Doe Lass, Ed Nabors, Jane Doe Nabors, Zions First National Bank, ABC Corporation, Student Loan Marketing Association, Arizona Educational Loan Marketing Corporation, United Student Aid Funds d/b/a Arizona Educational Loan Program, Accrediting Bureau of Health Education Schools/Programs, and National Association of Trade and Technical Schools, Defendants.**

**No. CIV 91–0728 PHX RCB.**

United States District Court,
D. Arizona.

May 4, 1992.

Cathy Lesser Mansfield, Community Legal Services, Urban Indian Law Office, Phoenix, AZ, and Erik M. O'Dowd, and Bruce A. Burke, O'Dowd, Burke & Lundquist, P.C., Tucson, AZ, for plaintiffs.

Gary L. Birnbaum and Kathryn A. Krecke, Mariscal, Weeks, McIntyre & Friedlander, P.A., Phoenix, AZ, for Zions First Nat. Bank.

Richard A. Segal, Gust Rosenfeld & Henderson, Phoenix, AZ, for United Student Aid Fund.

Stephen E. Richman, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, AZ, for Student Loan Marketing Ass'n.

Charles E. James, Jr., Snell & Wilmer, Phoenix, AZ, for Arizona Educational Loan Marketing Corp.

Clint W. Smith, Smith & Evans, Mesa, AZ, for defendants Nabor.

David L. White and Joseph D. Romley, Jennings, Strouss & Salmon, Phoenix, AZ, for Nat. Ass'n of Trade and Technical Schools.

David C. Tierney, Sacks, Tierney, Kasen & Kerrick, Phoenix, AZ, for Accrediting Bureau of Health Educ. Schools/Programs.

## ORDER

BROOMFIELD, District Judge.

In this order, the court addresses five motions: (1) Financial Defendants' Joint Motion to Dismiss, (2) United Student Aid Funds' Motion to Dismiss, (3) National Association of Trade and Technical Schools' Restated Motion to Dismiss, (4) Accrediting Bureau of Health Education Schools/Programs' Motion to Dismiss, and (5) Plaintiffs' Motion to Strike Supplemental Memorandum in Support of Financial Defendants' Joint Motion to Dismiss.

## I. BACKGROUND INFORMATION

Plaintiffs, on behalf of themselves and former students of Tempe Technical Institute, Inc. ("TTI"), filed a class action against the above named defendants for fraud, consumer fraud, negligent misrepresentation, state racketeering, breach of contract, breach of fiduciary duty, conversion, negligence, and violations of the Higher Education Act of 1965 (the "Act"), 20 U.S.C. § 1070 *et seq.*

Defendants include (1) TTI and several officers, shareholders, and employees of TTI, collectively known as the "TTI defendants";[1] (2) Zions First National Bank ("Zions"), ABC Corporation (which assumed the assets and liabilities of Merabank), Student Loan Marketing Association ("Sallie Mae"), Arizona Educational Loan Marketing Corporation ("AELMC"), and United Student Aid Funds ("USAF"), collectively known as the "financial defendants"; and (3) the Accrediting Bureau of Health Education Schools/Programs ("ABHES") and National Association of Trade and Technical Schools ("NATTS"), collectively known as the "accreditor defendants."

TTI was a for-profit vocational school that operated from about September 15, 1988 through about April 11, 1990. Tempe Technical Institute, Inc. filed for relief under Chapter 7 of the United States Bankruptcy Code after plaintiffs filed this lawsuit. Plaintiffs were students at TTI who took out guaranteed student loans ("GSL") through either Zions or Merabank. These loans were guaranteed by USAF pursuant to the Act. The loans are now held by either Sallie Mae or AELMC.

Plaintiffs allege that defendants participated in a scheme in which economically deprived individuals were recruited by commissioned sales persons, enrolled in school,

---

1. The TTI defendants are not parties to any of the motions addressed in this order.

and signed up for federally guaranteed loans. Plaintiffs contend that they enrolled in the school because of the school's accreditation and because of oral and written representations made to them by various defendants. Plaintiffs allege that they subsequently discovered that the inducements were fraudulent and that material information had been concealed. Finally, plaintiffs assert that TTI failed to provide them with promised education and services for which TTI was paid by either Zions or Merabank.

Plaintiffs seek rescission of their enrollment contracts, restitution and damages, and a declaratory judgment that student loans are not due and owing. Plaintiffs also seek an injunction against all collection efforts, against the submission of negative credit reports, and against assignment or sale of their loans pending resolution of this case.

Defendants ABHES, NATTS, USAF, and the financial defendants collectively [2] have filed motions to dismiss for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Pursuant to the court's June 24, 1991 order, these motions are limited to two issues: (1) whether the Higher Education Act preempts state law claims relating to guaranteed student loans, and (2) whether the Act creates an implied private right of action. Neither the Ninth Circuit nor this district have addressed these issues. Other district courts that have struggled with these issues are split.

## II. DEFENDANTS' MOTIONS TO DISMISS

### A. *Characterization of the motions*

All of the defendants have referred to their motions as motions to dismiss. Various defendants, however, have attached documents to their pleadings, thus raising the question of whether the court should treat these pleadings as motions for summary judgment.[3] Rule 12(b) states,

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b).

The Ninth Circuit has held that the court may take judicial notice of facts outside the pleadings, administrative records and other "matters of public record" without converting the motion to a motion for summary judgment. *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1281 (9th Cir.1986).

The following documents have been attached to the pleadings: unpublished case decisions, manuals on accreditation policies and procedures by both NATTS and ABHES, a letter from a pro-tem state judge to counsel, a brief submitted by the Department of Education ("DOE") as defendant in an unrelated case, notices published in the federal register, a DOE memo on "Compromise and Write-Off" procedures, and various correspondence involving the DOE. In reaching its decision, the court considered only the following documents: the unpublished case decisions and notices from the federal register. The court excludes all other attached documents. All of the documents considered by the court are matters of public record. Consequently, the court need not convert defendants' motions to dismiss into motions for summary judgment.

### B. *Pre-emption of State Law Claims*

1. Legal Standard

In determining whether state statutory or common law is preempted by the Higher Education Act, the court must ascertain the intent of Congress. *Califor-*

---

**2.** Defendant ABC Corporation was not served with the complaint and is not a party to this motion.

**3.** None of the parties have objected to attachments submitted by other parties.

*nia Federal Savings and Loan Association v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). Congressional intent to pre-empt state law may be found in the express language of the statute or may be inferred "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that congress 'left no room' for supplementary state regulation." *Id.* 479 U.S. at 280–81, 107 S.Ct. at 689. Furthermore, federal law may pre-empt state law to the extent that state law actually conflicts with federal law. *Id.* A conflict can arise "because 'compliance with both federal and state regulations is a physical impossibility,'" *id.* 479 U.S. at 281, 107 S.Ct. at 689 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)) "or because the state law stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). "[P]re-emption is not to be lightly presumed." *Id.*

### 2. Presumption Against Preemption

Plaintiffs argue that they are entitled to a presumption against pre-emption of their state claims because their claims are in areas traditionally regulated by the states. The financial defendants argue against such a presumption because GSLs are creatures of federal statutory law and are not traditionally regulated by the states. Defendant ABHES argues that while states have a role in certifying schools, regulation of accrediting agencies under a federal statute is not typically accomplished through private actions asserting state common law remedies.

■ When Congress legislates in a field traditionally occupied by states, the court begins its analysis with a presumption against pre-emption of state law. *West v. Northwest Airlines, Inc.,* 923 F.2d 657, 659 (9th Cir.1990) (common law tort and contract remedies in business relationships warrant presumption against finding pre-emption of state law). While guaranteed

student loans are creations of federal statute, plaintiffs' claims against the financial defendants would exist even if the loans had been "common" loans not guaranteed by the government. In addition, while negligence tort claims are traditional state claims, negligence claims regarding the accreditation of a school for participation in a federal program are not in an area traditionally regulated by the states. Thus, the court considers plaintiffs' claims against the financial defendants to be in an area traditionally regulated by the state and therefore entitled to a presumption against pre-emption. Plaintiffs' claims against the accreditor defendants are not in areas traditionally regulated by the state and therefore are not entitled to a presumption against preemption.

### 3. Implied Preemption

■ All parties agree that the Higher Education Act does not expressly state a congressional intent to preempt state law regarding guaranteed student loans. Defendants, however, argue that congressional intent to preempt state law can be inferred from either the comprehensive nature of the Act and its regulations or the fact that plaintiffs' state claims conflict with the objectives of the program.

#### i. Comprehensive Nature of the Act

The financial defendants argue that the GSL regulatory scheme is sufficiently comprehensive for the court to infer that congress left no room for state tort or contract remedies. Defendants point out that the Act (1) prescribes which schools, lenders, borrowers, and guaranty agencies may participate in the GSL program, 20 U.S.C. §§ 1085(a)-(d), (j), and 1091, (2) grants the Secretary of Education ("Secretary") broad enforcement authority to "enforce, pay, compromise, waive, or release any right, title, claim, lien or demand, however, acquired, including any equity or any right of redemption," *id.* § 1082(a)(6), (3) permits the Secretary to impose civil penalties of up to $25,000 upon a lender or guaranty agency which violates provisions of the Act or substantially misrepresents finance

charges, *id.* § 1082(g), and (4) allows the Secretary to terminate a lender's participation in the GSL program if the lender fails "to exercise reasonable care and diligence in the making and collecting of loans," *id.* § 1082(h)(1)(A)(i)(I).

Similar to the financial defendants, the accreditor defendants argue that the comprehensive nature of the Act preempts plaintiffs' state law claims. Defendant NATTS asserts that GSL regulations make no provisions for the private remedies sought by plaintiffs and that the sole remedy against an accrediting agency who fails in its responsibilities is the initiation of a show cause proceeding by the Department. 34 C.F.R. § 602.3(d).

Defendant ABHES argues that the Act comprehensively "occupies the field" and leaves no room for plaintiffs' common law actions. Defendant ABHES asserts that even if the Act only selectively preempts state law in the field of guaranteed student loans, the Act fully preempts state law in the "sub-area" of accreditation. Defendant ABHES asserts that the Act completely governs the role of accreditors in the GSL program, including the means for "hiring and firing" accrediting agencies.

The financial defendants and ABHES refer the court to *Graham v. Security Savings and Loan,* 125 F.R.D. 687 (N.D.Ind. 1989), *affirmed on other grounds sub nom. Veal v. First American Savings Bank,* 914 F.2d 909 (7th Cir.1990), to support their argument. In *Graham,* the court found that a detailed and extensive body of federal law governed the GSL program, including available remedies upon default. *Id.* at 692. That court concluded that rescission of the contract based on fraud was not a permissible remedy because it was preempted by the Act. *Id.* Rather, the court stated that the only remedies for fraud were administrative penalties, including termination of participation in the GSL program. *Id.* at 692 n. 6.

 Plaintiffs initially argue, and the court agrees, that the mere existence of a detailed and extensive regulatory scheme does not by itself imply an intent to preempt state remedies. *See English v. Gen-*

*eral Electric Co.,* 496 U.S. 72, 110 S.Ct. 2270, 2279, 110 L.Ed.2d 65 (1990).

Plaintiffs next argue that congressional intent not to pre-empt all state law is evident because the Act implicitly incorporates certain state law. Plaintiffs point out that the Act requires student loan promissory notes to be "legally enforceable." *See e.g.* 34 C.F.R. §§ 682.206(d)(1) (lender must obtain "legally-enforceable" promissory note from borrower), 682.513 (Secretary can refuse to pay a claim if a loan is not a "legally enforceable obligation") (1990). Because the Act and its regulations do not define "legally enforceable," plaintiffs argue that congress intended state law to control this issue.

Plaintiffs further argue that congress's selective preemption of certain aspects of state law indicates that congress did not intend the Act to pre-empt all aspects of state law. *See e.g.,* 20 U.S.C. § 1091a(a, b) (statute of limitations and collection expense laws); *id.* § 1078(d) (state usury laws); § 1099 (state disclosure requirements); and *id.* § 1091a(b)(1, 2) (pre-emption of specific state law defense of infancy).

Finally, plaintiffs argue that the Department of Education recently has affirmed Congress's intent to only preempt directly conflicting law. Plaintiffs refer the court to a recent interpretation on the peremption of certain state laws by the Higher Education Act on loan collection, in which the Secretary states:

> The regulations in § 682.410(b)(4)(vii)-(xi) generally require guarantee agencies to sue defaulters and to attempt to enforce judgments entered against defaulters, but do not otherwise dictate the manner in which the agency must conduct the litigation or enforce the judgment. Therefore, the regulations do not preempt State law that would affect the conduct of litigation or the enforcement of judgments, but would only preempt those State laws, if any, that would conflict with the regulatory requirement that a guarantee agency initiate suit and attempt to enforce a judgment.
>
> . . . .

... In addressing the preemptive effect of these collection regulations, the Secretary likewise does not suggest that other provisions of GSL regulations ... do not also preempt State law if a direct conflict exists between the requirements of the regulations and State law, or if compliance with State law would frustrate achievement of the purposes of the regulations.

55 Fed.Reg. 40120, 40122 (October 1, 1990) (footnote omitted).

▆▆ Federal regulations must be "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Guerra*, 479 U.S. at 280–81, 107 S.Ct. at 689. Where the alleged preempted field traditionally has been occupied by the States, "congressional intent to supersede state laws must be 'clear and manifest.'" *English*, 496 U.S. at 79, 110 S.Ct. at 2275 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)).

After reviewing the statute, regulations and the previously cited notice of interpretation by the Department of Education, the court does not find clear and manifest congressional intent to wholly pre-empt state law. In fact, the court finds no congressional intent to wholly preempt state law. Rather, the court finds that, other than state law expressly preempted in the Act, Congress intended the Act to preempt only state law that directly conflicted with the federal regulatory scheme.

### ii. Conflict with the Act

As stated previously, state law conflicts with federal law when compliance with both state and federal law is an impossibility or when state law stands as an obstacle to the accomplishment of congressional objectives.

The financial defendants first argue that, because of federal government interests in preserving the Treasury and protecting the security of federal investments, federal law governs the availability of remedies upon default of a federally insured loan. Furthermore, the financial defendants assert, state law conflicts with federal law which discharges a student from the obligation to repay the loan only in three circumstances: death of the student, disability of the student, and discharge of the student loan through bankruptcy. Finally, the financial defendants assert that recognition of plaintiffs' state law remedies would discourage lender participation and thus would present a significant obstacle to the achievement of Congress's objectives.

Defendant ABHES asserts that in order to induce banks to make student loans, the Act limits relief to a student borrower to situations involving death, disability, and discharge through bankruptcy.[4] In addition, ABHES argues that if accrediting agencies were exposed to "disgruntled students," accrediting agencies likely would cease to participate in the accreditation process or the accrediting process would become so complicated and expensive that schools would discontinue participation in the accreditation process. Defendant ABHES concludes that either of these results would thwart congressional purposes.

Defendant NATTS argues that recognition of plaintiffs' state claims would thwart congressional purpose by preventing the Department of Education from determining a national standard of care for federally recognized accrediting agencies. Defendant correctly asserts that plaintiffs' claims could result in a state law determination that NATTS has not served as a reliable accrediting authority even though, under federal law, NATTS is recognized as a reliable authority.

Plaintiffs first argue that their state claims against the financial defendants do not conflict with the Act merely because the Act has stated that a student's responsibility to repay the loan is discharged by death, disability, and bankruptcy. Plaintiffs assert that this section of the Act addresses the dischargeability of enforce-

---

**4.** Defendant ABHES provides no authority for its statement that congress relieved a borrower's responsibility to repay its loan in only these circumstances as an inducement to potential lenders.

able loans, while their state claims address the underlying enforceability of the loans. Plaintiffs refer the court to a brief submitted by the Department of Education in a Seventh Circuit case, which states:

[I]nference of an implied preemption drawn from these discharge provisions is not well founded. These provisions address the discharge of a valid and otherwise enforceable loan obligation. Neither these nor any other provisions of the [Act] cited by the court refer to defenses against the initial validity of a loan obligation. Moreover, these discharge provisions do not state that no other law may affect the liability of the borrower.

To the contrary, Department regulations under the [Federal Insured Student Loan] program make clear that the lender may receive payment on the Government guarantee in the event of death, disability, or bankruptcy of the borrower *only* to the extent that the claim amount is a legally enforceable obligation of the borrower. 34 C.F.R. § 682.513(a)(1).

Department of Education's Brief at 18, *Veal v. First American Savings Bank,* 914 F.2d 909 (7th Cir.1990) (Nos. 89–1895 and 89–1919).

Plaintiffs also refer the court to *Tipton v. Secretary of Education,* 768 F.Supp. 540, 554 (S.D.W.Va.1991), which held that

the existence of state law defenses to the enforceability of a student's loan obligation does not conflict with the statutory provisions of the [Higher Education Act], but is instead indicative of congressional recognition that the underlying loan obligation must itself be an enforceable one under state law.

*Tipton,* 768 F.Supp. at 557. Plaintiffs conclude that Congress could not have intended that students who were victims of fraud would remain liable for loans except when the student dies, becomes disabled, or goes bankrupt.

Plaintiffs next argue that because none of the alleged dishonest acts of the financial defendants were expressly dictated by the Act or its regulations, a conflict does not exist because it is not impossible to comply with both state and federal law. Finally, plaintiffs argue that their state claims do not thwart the Act's goals or purpose because Congress wanted responsible lender participation, not lender participation at all costs. Rather, plaintiffs assert, plaintiffs' state claims will merely discourage lenders from irresponsibly entering into relationships with schools that commit fraud.

With respect to the accrediting defendants, plaintiffs argue that the Act and regulations only establish procedures and criteria for federal recognition of accrediting agencies and do not govern the standards for accreditation. Contrary to assertions by the accrediting defendants, plaintiffs assert that the regulations provide no mechanism for sanction of or remedy against an accrediting agency that fails to be a "reliable authority" on the quality of education provided as required by the Act. Plaintiffs contend that it is not impossible to comply with both the Act and state tort law. Finally, plaintiffs argue that their claims will further the objectives of the Act because they will insure that accrediting agencies are "reliable authorities" on the quality of post-secondary educational institutions.

The court agrees with the financial defendants that federal law governs available remedies under the Act. This conclusion, however, does not end the analysis as the court must determine whether federal law incorporates state law in determining the enforceability of a loan.

The court finds a conceptual difference between the underlying validity or enforceability of a loan and dischargeability of that loan in various circumstances. Furthermore, it is not physically impossible to comply with both state laws regarding the enforceability of a loan and federal laws regarding the dischargeability of a loan. Thus, the court will infer pre-emption of state law governing enforceability only if it finds that plaintiffs' claims present an obstacle to the accomplishment of congressional objectives.

The primary goal of the Higher Education Act is to promote access to edu-

cation. S.REP. No. 673, 89th Cong., 1st Sess. 37, *reprinted in* 1965 U.S.C.C.A.N. 4027, 4055. Maximum lender participation, however, is critical to achievement of this goal. *See Tipton,* 768 F.Supp. at 560. Defendants argue that plaintiffs' claims will frustrate the objectives of the Act and refer the court to *Graham v. Security Savings and Loan,* 125 F.R.D. 687, 693 n. 7 (N.D.Ind.1989), *aff'd on other grounds sub nom. Veal v. First American Savings Bank,* 914 F.2d 909 (7th Cir.1990),[5] which states:

> [A] state law claim for rescission conflicts with federal objectives. As defendants point out ... '[r]escission would discourage future participation in the GSL program by lenders and thwart Congress's intent 'to increase loan availability by making the [GSL] Program more attractive to commercial lenders'.'

*Id.* at 693 n. 7 (quoting 1980 U.S.C.C.A.N. 3168).

Plaintiffs argue that their claims will not frustrate the objectives of the Act and cite to *Tipton,* in which the court found

> no clear basis upon which to conclude that, by encouraging maximum lender participation in the GSLP, Congress intended for lenders with a close connection to a participating school to be absolutely shielded from liability when a student's loan obligation has been tainted by misconduct on the part of that school sufficient to adversely affect the enforceability of the student's loan.

*Tipton,* 768 F.Supp. at 560.

The court finds the reasoning of the *Tipton* court persuasive.[6] Several circuit courts have recognized the validity of student defenses to the enforceability of a loan, other than death, disability, and discharge through bankruptcy. First, the

court notes that the *Graham* case, cited by defendants, was affirmed on grounds other than preemption. *Veal v. First American Savings Bank,* 914 F.2d 909 (7th Cir.1990). In fact, contrary to defendants' assertions, the *Veal* court stated, in dicta, that if sued by a lender a student could assert applicable state law defenses. *Veal,* 914 F.2d at 914–15 n. 7.

A District of Columbia Circuit court similarly permitted a student to raise state law defenses regarding the validity of the student loan. *United States v. Griffin,* 707 F.2d 1477 (D.C.Cir.1983).[7] The *Griffin* court stated:

> "Far from conflicting with the aims of the statute, this policy [of recognizing student defenses] is a logical outgrowth of the Program's purposes. A policy of recognizing student defenses in no way means that the government will regularly bear losses on these loans. Normally, the government can turn around and recover from the lender default claims paid on obligations not in fact owed."

*Griffin,* 707 F.2d at 1482–83 (D.C.Cir.1983).

Finally, a Court of Claims decision implicitly recognized that the existence of a valid and enforceable loan obligation was necessary for the effective functioning of the guaranteed student loan program. *American Bank of San Antonio v. United States,* 633 F.2d 543, 547, 224 Ct.Cl. 482 (1980) (Concerned that the bank's claim against a student might not be enforceable because the bank had altered the promissory note, the court stated that "[u]nless the bank's claim against the student is enforceable at the time of assignment, the subrogation rights the government receives in exchange for the insurance payments [will] be worthless.")

---

**5.** The Seventh Circuit held only that plaintiffs failed to allege a connection between the fraudulent activity of the school and the defendants, and thus plaintiffs failed to state a claim for relief. The Seventh Circuit did not address the issue of pre-emption of state law remedies. *Veal,* 914 F.2d at 909, 914.

**6.** The *Graham* court provides scant reasoning to support its conclusion that a state law claim for rescission conflicts with federal objectives.

**7.** The GSL program has two parts: (1) a guaranty agency program under which state or private companies guarantee a student loan and in turn is reimbursed by the Secretary, and (2) the Federal Insured Student Loan Program ("FSLIP") under which the federal government directly guarantees the student loans. *Tipton,* 768 F.Supp. at 545. Unlike the case at hand which involves the guaranty agency program, the *Griffin* case involved the FSLIP.

Both the language of the Higher Education Act and its regulations refer to the need for enforceable contracts. Section 1077, addresses requirements for insurable loans and provides that a loan by an eligible lender shall be insurable if, among other requirements, it is

evidenced by a note or other written agreement which—(A) is made without security and without endorsement, except that if the borrower is a minor and such note or other written agreement executed by the borrower would not, under the applicable law, create a binding obligation, endorsement may be required.

20 U.S.C. § 1077(a)(2)(A). If state law was not relevant to the creation of a binding obligation, congress would have no need to refer to "the applicable law."

In addition, regulations for the guaranteed student loans refer to legally enforceable obligations. The regulations require a lender to exert due diligence in making a loan and specifically requires the lender to obtain a legally-enforceable promissory note for each loan. 34 C.F.R. §§ 682.-206(d)(1). In addition, the Secretary can refuse to pay a claim if the loan is not a legally enforceable obligation. *Id.* § 682.-513. Neither the Act nor its regulations define "legally enforceable."

█ Thus, it appears to this court that, except for state law expressly preempted by the Act, congress intended state law to determine whether a student loan obligation was legally enforceable. The court finds no congressional intent, however, to allow state claims against participants in the guaranteed student loan process which do not concern the enforceability of the obligation.

█ Furthermore, the court agrees with the accreditor defendants that permitting state claims against accrediting agencies that comply with the Act and its regulations would frustrate the structure of the guaranteed student loan program. Negligence tort law varies from state to state. Allowing state negligence claims could result in numerous and unpredictable standards for performance. Such confusion and lack of direction regarding compliance could well discourage participation by accrediting agencies in the program.

The court also notes that the states need not depend on such tort suits to insure competent accreditation within their state. Before a school can participate in the guaranteed student loan process, it must be licensed by the state in which it is located. 20 U.S.C. §§ 1085(c)(2), 1088(b)(2); 34 C.F.R. § 602.19 (1990). Therefore, a state can sufficiently protect its interests in assuring competent accreditors through this licensing process, without injecting unpredictability and confusion into the guaranteed student loan program.

Caselaw previously cited by the court allowed students to defensively assert state law defenses. None of these cases involved a situation where a student, as a plaintiff, affirmatively asserted fraud or other state law claims. The court notes, however, that in many cases students may be harmed through fraudulent transactions and yet may never have the opportunity to address the harm. A student's credit rating may be ruined long before a bank, a guarantor, or the government sues the student for repayment on the loan. A student and his or her family may be forced to endure collection efforts or even harassment from collection agencies. Limiting a student's ability to assert fraud and other state law defenses to the situation where the student is sued does not provide an adequate remedy to students who may be victimized through fraudulent activities.

██ The court holds that plaintiffs' state law claims addressing the underlying enforceability of the student loan obligations are not preempted by the Act. The court, however, holds that plaintiffs' state law claims against the accrediting agencies are preempted by the Act and therefore dismisses all state law based claims against the accreditor defendants.

## D. *Private Cause of Action for Violations of the Act*

█ The second issue before the court on defendants' motion to dismiss is whether the Act implies a private right of action.

Plaintiffs asserts claims based on violations of the Act against both the financial defendants and the accreditor defendants. Specifically, plaintiffs allege that the financial defendants violated regulations by (1) intentionally omitting required information to prospective students, 34 C.F.R. § 668.-41–.45, (2) participating in student loan programs when not eligible because TTI employed commissioned salesmen to promote the program, *id.* § 682.200, (3) issuing loans to ineligible borrowers, *id.* § 682.-206(c), (4) allowing TTI to originate loans without a loan origination agreement, *id.* § 682.200, .206(a)(2), .601, and (5) improperly delegating loan making functions to TTI, *id.* § 682.206(a)(2). Plaintiffs also specifically allege that the accreditor defendants violated regulations by failing to properly investigate, audit or review TTI before and during its accreditation. 34 C.F.R. § 602.-17–.18 Finally, plaintiffs generally allege other violations of the Act which may become apparent during discovery.

The parties agree that the Act does not expressly provide for a private cause of action and that the proper analysis for determining whether the Act implies a private cause of action is outlined in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In *Cort*, the Supreme Court identified four factors for analysis:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* 422 U.S. at 78, 95 S.Ct. at 2088 (internal citations omitted). Finally, the Ninth Circuit has indicated that it will not imply a private cause of action unless "ineluctable inferences arise from the Act to compel such a finding," *Miscellaneous Service Workers, Drivers & Helpers, Teamsters Local # 427 v. Philco–Ford Corporation, WDL Division*, 661 F.2d 776, 781 (9th Cir. 1981); *see also West Allis Memorial Hospital, Inc. v. Bowen*, 852 F.2d 251, 254 (7th Cir.1988) ("[A] strong presumption exists against the creation of [ ]implied rights of action.").

Regarding the first factor, the court clearly finds that students do belong to the class for whose benefit the Higher Education Act was enacted. The primary goal of the Act is to provide access to education and plaintiffs are or were students.

The second *Cort* factor requires the court to analyze legislative intent to create or prohibit a private cause of action. Unless congressional intent to create a private cause of action "can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981). Rather than providing references to the Higher Education Act or legislative history implying a private cause of action, plaintiff argues that the court should find a private cause of action because the Act lacks effective administrative remedies for the protected student class. *See Cannon v. University of Chicago*, 441 U.S. 677, 706 n. 41, 99 S.Ct. 1946, 1962–63 n. 41, 60 L.Ed.2d 560 (1979).

Third, the court must consider if implying a remedy for borrowers is consistent with the underlying purpose of the legislative scheme. The specific purposes of the Act are to encourage lenders to make student loans, to provide student loans for students who do not otherwise have access to such loans, to pay a portion of the interest on these loans, and to guarantee lenders against losses. 20 U.S.C. § 1071(a)(1); *see also* 34 C.F.R. § 682.100 (1990). Allowing student borrowers to sue lenders and accrediting agencies likely will not further these specific purposes.

Finally, the court must determine whether the cause of action is one traditionally relegated to state law so that it would be inappropriate to infer a cause of action based solely on federal law. Plaintiff is essentially suing defendants for negligent and fraudulent business activities, negligent accreditation, conversion, breach of contract and breach of fiduciary duties. As stated earlier, with respect to the financial defendants, this court holds that these actions have traditionally been relegated to state law.

Considering these factors in light of the presumption against the creation of implied rights, the court concludes that the Higher Education Act neither expressly nor impliedly provides plaintiffs with a private right of action. While basing its decision on the above analysis, the court notes that its holding is in agreement with the majority of district courts that have addressed this issue. *See, e.g., Hudson v. Academy of Court Reporting*, 746 F.Supp. 718 (S.D.Ohio 1990); *St. Mary of the Plains College v. Higher Education Loan Program of Kansas*, 724 F.Supp. 803 (D.Kan. 1989); *Graham*, 125 F.R.D. at 687. *But see De Jesus Chavez v. LTV Aerospace Corp.*, 412 F.Supp. 4 (N.D.Tex.1976).

## III. MOTION TO STRIKE SUPPLEMENTAL MEMORANDUM

Two weeks after oral argument on defendants' motions to dismiss, the financial defendants' filed a supplemental memorandum in support of their joint motion to dismiss. Plaintiffs' object to this supplemental briefing and request the court to strike the memorandum.

Plaintiff argues that the court should strike this document because Local Rule 11 prohibits briefs beyond the motion, response, and reply and because the issues in the supplemental memorandum were previously presented by the financial defendants in their reply.

As plaintiff does not allege any prejudice as a result of the supplemental memorandum, the court will allow filing of the document and denies plaintiffs' motion to strike.

## IV. CONCLUSION

The court concludes that the Act does not pre-empt plaintiffs' state law claims against the financial defendants regarding the enforceability of the loan, but does pre-empt plaintiffs' state law claims against the accreditor defendants. The court holds that the Act does not imply a private cause of action to plaintiffs. Finally, the court denies plaintiffs' motion to strike.

Once plaintiffs' claims based on the Higher Education Act are dismissed, plaintiffs' complaint becomes comprised solely of state law based claims.[8] In light of this fact, the court is considering whether it should decline jurisdiction over the remaining state claims pursuant to 28 U.S.C. § 1367(c). The parties shall have thirty (30) days from entry of this order to respond to the court on the issue of whether this court should decline jurisdiction.

IT IS ORDERED granting in part and denying in part defendant United Student Aid Funds motion to dismiss (Doc. 6). Counts eight and nine of plaintiffs' complaint are dismissed as against defendant United Student Aid Funds.

IT IS FURTHER ORDERED granting in part and denying in part the financial defendants' joint motion to dismiss (Doc. 31). Counts eight and nine of plaintiffs' complaint are dismissed as to these defendants.

IT IS FURTHER ORDERED granting defendant National Association of Trade and Technical Schools' restated motion to dismiss (Doc. 34) and denying defendant National Association of Trade And Technical Schools' motion to dismiss as moot (Doc. 8).

IT IS FURTHER ORDERED granting defendant Accrediting Bureau of Health

---

**8.** The court recognizes that plaintiffs have asserted a cause of action under the Higher Education Act against Tempe Technical Institute, who was not a party to these motions. The court's determination that the Higher Education Act does not create a private cause of action for plaintiffs against the financial defendants and the accreditor defendants, however, applies equally to this cause of action as against Tempe Technical Institute.

and Education Schools/Programs motion to dismiss (Doc. 20).

IT IS FURTHER ORDERED denying plaintiffs' Motion to Strike Supplemental Memorandum in Support of Financial Defendants' Joint Motion to Dismiss (Doc. 56).

IT IS FINALLY ORDERED granting the parties thirty (30) days from entry of this order to respond to the court on the issue of whether this court should decline jurisdiction over the remaining viable claims.